UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DIAMOND ELLIE PUENTES,

                    Plaintiff,

      -against-                            1:23-CV-373 (LEK/DJS)

UNION COLLEGE, *et al.*,
                    Defendants.

---

## MEMORANDUM-DECISION AND ORDER

## I.  INTRODUCTION

On February 28, 2023, Plaintiff Diamond Ellie Puentes filed this action in New York State Supreme Court, County of Schenectady, against Union College, Angela Stefanatos ("Stefanatos"), Fran'Cee Brown-McClure ("Brown-McClure"), Vincent Zeccola ("Zeccola"), David R. Harris ("Harris"), Phillip Wadja ("Wadja"), and John Does 1–25 (collectively, "Defendants"). See Dkt. No. 2 ("Complaint"). Defendants later removed this action to this Court on March 24, 2023. See Dkt. No. 1. Defendants now move to dismiss this action pursuant to Federal Rule Civil Procedure 12(b)(6). Dkt. No. 8-1 ("Motion"). Plaintiff has filed a response, Dkt. No. 14 ("Response"), and Defendants have filed a reply, Dkt. No. 16 ("Reply").

For the reasons that follow, Defendants' Motion is granted in part and denied in part.

## II.  BACKGROUND

The following facts are set forth as alleged in Plaintiff's Complaint. See Compl. ¶¶ 1–142.[1]

---

[1] Citations to paragraphs in the Complaint refer to those paragraphs located in the "Statement of the Case" section. All other citations refer to ECF pagination.

Plaintiff is a first-generation American citizen, who comes from a Latin American family and has limited financial resources. See Id. ¶¶ 1–2. Union College is a private higher education institution located in Schenectady, New York. See id. ¶ 13. All other Defendants are either employed by or serve on the Board of Trustees of Union College: Stefanatos serves as the college's Director of Health Services; Brown-McClure was employed as the Vice President for Student Affairs and Dean of Students at the time of the events of this action; Zeccola serves as Collaborating Physician for the college; Harris serves as the president of Union College; Wadja serves as the Director of Media and Public Relations; and John Does 1–25 are individuals whose names are not known but are "directly or indirectly responsible for any or all of the alleged acts" described in Complaint. See id. ¶¶ 13–19.

Plaintiff was a student at Union College, matriculating in 2020. See id. ¶ 22. Plaintiff received Union College's Academic Opportunity Scholarship ("AOP Scholarship"), which provides financial assistance for out-of-state students "from first-generation, low-income backgrounds through academic counseling and financial aid." Id. ¶ 23 (internal quotation marks omitted). To continue receiving the AOP Scholarship, Plaintiff was required to maintain a minimum grade point average and continue to exhibit financial need. See id. ¶ 26.

Upon accepting an offer to attend Union College on the AOP Scholarship, Plaintiff received Union College's Student Handbook ("Handbook"), "which contained provisions related to both the college and student's reasonable expectations as to how the college was run and what the student's requirements were to succeed at the college." Id. ¶ 24. Plaintiff describes the Handbook as "contractual in nature with respect to its terms of general applicability to all students and/or the college." Id. ¶ 25. The Handbook contained a policy related to immunizations ("Immunization Policy"), requiring students "provide proof of immunization to measles, mumps,

and rubella." Id. ¶ 29. Union College also required students be vaccinated against meningococcal meningitis. See id. ¶ 32. The Immunization Policy specifies that students may receive an exemption from the immunization requirements "if a licensed physician or nurse practitioner certifies that such immunization is detrimental to the student's health or otherwise medically contraindicated, or if immunization is contrary to the student's genuine and sincere religious beliefs." Id. ¶ 34. The Immunization Policy contained no language regarding the COVID-19 vaccine or any related booster vaccine, see id. ¶ 35, nor did the Handbook provide any "mechanism for imposing an additional vaccine requirement," id. ¶ 41.

In July 2021, Union College sent an email to its students stating that both students and faculty needed to receive a COVID-19 vaccine before arriving on campus for the fall semester. See id. ¶ 37. Union College expected "at least 99 percent of students" would "be fully vaccinated," and warned that "[u]nvaccinated students will not be allowed to move in or gain access to College facilities"—although "[a] very small number of individuals" had "been granted exemptions from vaccination on religious or medical grounds." Id.

On August 6, 2021, Plaintiff sent an application to Union College requesting a religious exemption to the COVID-19 vaccine requirement. See id. ¶ 44. In her application, Plaintiff "did not specify a religion or any affiliation with any denomination or church but referenced the 'Holy Bible' and her biblical beliefs." Id.; see also id. at 45–47 (attaching Plaintiff's application for an exemption as an exhibit). Eleven days later, Union College's Office of the Dean of Students emailed Plaintiff, stating that Plaintiff's "request could not be reviewed at that time because it was missing a notarized religious organization form and/or letter of support." Id. ¶ 45. Six days later, on August 23, 2021, Plaintiff "received another email denying her religious exemption request due to failure to provide the 'additional materials.'" Id. ¶ 46.

On August 24, 2021, Plaintiff chose to receive the first dose of the Pfizer COVID-19 vaccine. See id. ¶ 48. After receiving her second shot in September 2021, Plaintiff "began to suffer from several medical ailments including sore throat, congestion, coughing, and difficulty breathing when exercising. Several days later, the symptoms escalated to vomiting, extreme abdomen pain, and diarrhea." Id. ¶ 51. Plaintiff subsequently visited Union College's health clinic and an emergency room at a local hospital to receive treatment for her symptoms. See id. ¶¶ 52–53. Plaintiff avers that prior to receiving her dual Pfizer vaccine, she had "no significant health issues," but now suffers from "continued pain, suffering, and ongoing gastrointestinal problems which were caused by the Pfizer shot." Id. ¶ 54. In December 2021, Plaintiff tested positive for COVID-19, which, according to Plaintiff, made Plaintiff "naturally immune" from COVID-19. See id. ¶¶ 58–64. Plaintiff states that both the original COVID-19 vaccine and the booster shots were "completely ineffective against contraction or transmission" of the virus. Id. ¶¶ 65–71.

In January 2022, Union College further "mandated its employees and students to receive either a Moderna or Pfizer COVID-19 booster shot five months after the second dose of vaccination." Id. ¶ 71. Plaintiff sent an email to Union College on March 26, 2022, "in which she expressed her fear of receiving a booster shot due to her hospitalization following her receiving the second Pfizer shot and requested an exemption from the mandate." Id. ¶ 73. Union College responded by instructing Plaintiff to submit medical documentation from her health care provider. See id. The following day, Plaintiff submitted "a copy of her hospital discharge papers . . . as proof that she had been made ill by the second Pfizer shot." Id. ¶ 76. The next day, Union College denied Plaintiff's exemption, and informed Plaintiff "that her hospital paperwork was insufficient support for the [exemption]." Id. ¶ 77. In the days following this denial, Plaintiff

experienced a series of health issues that were "caused by her receiving the second Pfizer shot," and visited Union College's health clinic, where she was seen by Stefanatos. Id. ¶¶ 78–79. Stefanatos "suggested that [Plaintiff] was not truly ill, but was just feigning illness to avoid getting the booster." Id. ¶ 80. Stefanatos also "offered no medical treatment" and "accused [Plaintiff] of having an eating disorder and had [Plaintiff] schedule [an] appointment with a nutritionist." Id. ¶ 81.

On April 8, 2022, Plaintiff visited Union College's office that manages the AOP Scholarship, seeking to extend the time "to provide her physician's medical exemption letter, which had not yet arrived." Id. ¶ 83. The AOP office called Stefanatos to discuss Plaintiff's situation, and Stefanatos responded, "[t]here is nothing a doctor is going to say or write that will make me change my mind." Id. ¶ 84. That same day, Plaintiff emailed Harris, and "expressed her fear of getting the booster and her frustration at the unilateral manner in which her exemption request was denied." Id. ¶ 85. Harris responded on April 9, 2022, stating: "[Brown-McClure] and I just spoke. I know that we tried to work with you on this. I do hope that you will choose to continue your education at Union." Id. ¶ 86; see also id. at 49.

Two days after this email exchange, on April 11, 2022, Plaintiff's primary care physician sent a letter to Union College's health clinic ("Physician Letter"). See id. ¶ 89. The Physician Letter recommended that Plaintiff "be 'granted an exception' from receiving the booster shot due to the 'severe, prolonged symptoms since receiving her COVID vaccines,' stating, 'getting this vaccine is ill advised' due to [Plaintiff's] 'unfavorable state of health, presumably caused by the vaccine itself.'" Id. (emphases omitted), see also id. at 51–52. That same day, Plaintiff "received an email from Union College's Office of Residential Life providing her with 72-hours' notice of eviction from campus housing due to her 'non compliance' with the booster mandate." Id. ¶ 91.

On April 13, 2022, Stefanatos emailed Plaintiff to say that, after reviewing the Physician Letter,

Stefanatos and Zeccola had denied Plaintiff an exemption, stating:

> Your marked weight loss and GI symptoms preceded the two
> vaccines, your weight was down 20 pounds from your baseline in
> June of 2022 and you received 2 doses of Pfizer in September. The
> vaccine is not associated with gastritis, which is the diagnosis you
> received in the ER two weeks after vaccination. Two episodes of
> streptococcal sore throat in 7 months is not an indication of a
> weakened immune system. There is no evidence in the literature that
> vaccination for Covid19 weakens the immune system . . . Please be
> advised that this decision is final. Please be further advised that any
> student who is denied an exemption and fails to comply with the
> COVID-19 vaccination requirement will be subject to conduct
> action.

Id. ¶ 93. Plaintiff states that she "had never described weight loss as one of her symptoms" to

Defendants. Id. ¶ 94.

Plaintiff subsequently sent information—information that was procured from a phone call

with a Pfizer representative—to Defendants supporting her claim that "the Pfizer shot was

known to cause gastritis as an adverse consequence to some of receiving the shot." Id. ¶¶ 102–

05. Union College again denied Plaintiff's exemption request. See id. ¶ 106.

On April 13, 2022, Union College told Plaintiff that "her 'classes will be dropped,' as a

result of purported noncompliance with the 'health requirements,' such that she would not be

permitted to live on campus any longer." Id. ¶ 107. Plaintiff received another notification that

day from Union College that she would be required to leave her campus housing the next day.

See id. ¶ 108. Plaintiff's meal card was also "terminated such that she could not eat on campus."

Id. ¶ 109. Plaintiff contacted Union College's Director of Community Standards, and her meal

card was temporarily reactivated, but the balance "was reduced to a mere $36.78, which was

insufficient to feed her while on campus for more than one day." Id. ¶¶ 111–12. According to

Plaintiff, "[w]hen the semester began only three weeks earlier, [Plaintiff's] meal plan had a

balance of over $451.78, most of which had been unused as of April 14, 2022." Id. ¶ 113.

Plaintiff requested that a recorded meeting be held between Plaintiff, Defendants, and Plaintiff's physician. See id. ¶ 117. Brown-McClure responded to the request by stating that "it was 'our preference' that there be no recording of the meeting which was solely to answer 'any medical questions that you or your physician may have,' since the meeting was 'not an appeal process or a discussion to reverse the decision.'" Id. ¶ 118. At the meeting, Stefanatos told Plaintiff "that COVID-19 poses a greater danger to [Plaintiff] than the shot, and that [Plaintiff] should get the Moderna booster if she had concerns about the Pfizer booster." Id. ¶ 121. Plaintiff noted in the meeting the evidence Plaintiff had sent to Defendants regarding gastrointestinal issues that might be caused by the COVID-19 vaccine. See id. ¶ 122. Stefanatos responded "that she did not believe that Pfizer was a valid source of such information . . . ." Id. The meeting concluded with Stefanatos stating that the "the shot has not been proven to prevent the spread of disease and that she was not advocating for requiring the booster to be mandated for the upcoming fall semester." Id. ¶ 123.

On April 14, 2022, Plaintiff was "was involuntarily expelled from all Union College classes, forced to vacate campus housing, and was not permitted to return physically back to the campus without receipt of a booster shot." Id. ¶ 137. The U.S. Department of Education has also informed Plaintiff "that she owes a partial school tuition reimbursement for the spring 2022 semester, despite only having attended three weeks of the semester, having complied with all obligations in existence when she agreed to attend the institution." Id. ¶ 138.

After Plaintiff left campus, her conflict with Union College gained local media attention. See id. ¶ 139. In the wake of this attention, Plaintiff states that "Union College has publicly

denied that it expelled Ms. Puentes." Id. On April 30, 2022, Wadja gave the following statement

to a local news outlet:

> While the college cannot discuss the situation surrounding
> [Plaintiff] . . . in general terms, we can state emphatically that no
> students have been expelled for refusing to get a booster shot. All
> students, faculty and staff are required to be vaccinated and boosted,
> with exceptions only being made for individuals who have been
> granted a medical or religious accommodation. An individual who
> chooses not to comply with our policy is not allowed on campus
> until they meet the requirement.

Id. On May 6, 2022, Plaintiff "was informed by individuals affiliated with Union College that

members of the Board of Trustees were slandering Ms. Puentes and claiming that she was being

untruthful in her representation of events regarding her expulsion." Id. ¶ 141.

Plaintiff now brings nine separate claims under federal and state law: (1) intentional

infliction of emotional distress ("IIED") against Defendants; (2) breach of contract against Union

College; (3) promissory estoppel against Union College; (4) discrimination on the basis of race,

color, religion, disability, and/or national origin pursuant to the New York Human Rights Law

("HRL") § 296 against Defendants; (5) exclusion of participation, denial of benefits, and

discrimination on the basis of disability and/or perceived disability pursuant to the Rehabilitation

Act, 29 U.S.C. § 794 ("Section 794") against Defendants; (6) negligence per se against Union

College; (7) negligence against Union College; (8) libel against Union College and Wadja; and

(9) slander against Union College and Wadja. See id. at 32–39.  Plaintiff seeks compensatory

damages, punitive damages, consequential damages, attorneys' fees and expert costs, and

interest. See id.

Defendants now move to dismiss all but two of Plaintiff's claims: Plaintiff's claim of disability and religious discrimination under HRL[2] and Plaintiff's claim of disability discrimination under Section 794. See Mot. at 10 n. 2.

## III.   LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Id. at 556.

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). The Supreme Court has stated that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (citing Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleading facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. See id. at 678–79.

---

[2] Defendants still move to dismiss Plaintiff's claims of race, color, and/or national origin under HRL. See Mot. at 19–21.

**IV.    DISCUSSION**

The Court reviews Defendants' arguments in the order that they are presented in the Motion.

**A.  IIED**

"In New York, to state a claim for intentional infliction of emotional distress, a plaintiff must allege: '(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress.'" Semper v. N.Y. Methodist Hosp., 786 F. Supp. 2d 566, 586 (E.D.N.Y. 2011) (quoting Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996)). New York law specifies that under the first element, a "defendant's conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303 (1983)). "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999). This standard is "extremely high," and as such, "[t]his highly disfavored cause of action is almost never successful." Semper, 786 F. Supp. 2d at 586 (quoting McGown v. City of New York, No. 09-CV-8646, 2010 WL 3911458, at *5 (S.D.N.Y. Sept. 9, 2010)). As Courts in this Circuit have specified, "[a]cts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of [IIED] because the conduct alleged is not sufficiently outrageous." Stevens v. New York, 691 F. Supp. 2d 392, 399 (S.D.N.Y. 2009) (citation omitted).

Defendants argue that "Plaintiff has made no attempt to identify any extreme or outrageous conduct giving rise to her claim." Mot. at 11. Plaintiff counters by effectively summarizing the allegations in the Complaint: that Defendants allegedly "forced [Plaintiff] to risk her health over the recommendations of her personal physician," engaged in "coercion and duress" to compel Plaintiff to receive the COVID-19 vaccine, denied Plaintiff's request for an exemption despite Plaintiff's "medical history and her own doctor's recommendations, and Pfizer's evidence," and defied Plaintiff's physician's recommendations. Resp. at 20–22. Plaintiff argues that Defendants demanded Plaintiff "play 'Russian Roulette' with her health," and as such, Defendants engaged in conduct that was "reprehensible, beyond the pale, and far beyond 'merely' harassment." Id. at 21–22.

Plaintiff's argument fails for two primary reasons. First, the Court cannot say that Defendants' conduct rose to a level "beyond all possible bounds of decency" that was "utterly intolerable in a civilized community." Semper, 786 F. Supp. 2d at 586. At most, Defendants' actions can be characterized as unaccommodating of Plaintiff's alleged medical and religious considerations, and insensitive to Plaintiff's health and financial situation. This does not, however, rise to the level of outrageous conduct that shocks the conscience. Plaintiff points to no analogous case law—and this Court is unaware of such law—that holds that a university's forceful attempts to vaccinate an enrolled student over their objections constitutes outrageous conduct. Colleges and universities place a high priority on maintaining healthy environments for their students, and many universities in New York State strongly enforced universal vaccinations in order to combat the COVID-19 pandemic.[3] In pursuing these policies, colleges are forced to

---

[3] For example, the State of New York required vaccinations for enrollment in state public institutions of higher education. See Edward McKinley, COVID-19 vaccination required for SUNY, CUNY students starting this fall, Times Union,

carefully balance the health and safety of their student populations against the individual liberties

of students who are unwilling or unable to receive the vaccine. An educational institution might

make a misstep while attempting to strike this balance; such mistakes are an inevitable

consequence of the widespread implementation of these complex and novel policies. But the

Court is not inclined to find that errors in policy implementation or administrative judgment are

"utterly intolerable in a civilized community," provided that they are not accompanied by—or an

expression of—more outrageous conduct.

Furthermore, Courts in this Circuit have dismissed IIED claims against higher education

institutions with facts far more extreme than this case. As Defendants point to in their motion,

the actions taken in Alexiadis v. N.Y. College of Health Professions were significantly more

egregious than the actions take in the instant case. 891 F. Supp. 2d 418 (E.D.N.Y. 2012). In

Alexiadis, the plaintiff removed hand sanitizer fluid from a dispenser and distributed the hand

sanitizer to other students. Id. at 423–24. The defendant-college had the plaintiff expelled and

criminally charged; the plaintiff alleged that this was done because he was HIV-positive, and that

the defendant-college had otherwise started treating him poorly once it learned of his diagnosis.

Id. Despite these actions, the Alexiadis court found that the plaintiff could not sustain an IIED

claim, as even an alleged expulsion on the basis of disability could not rise to the requisite level

of unconscionability. Id. at 436–37 (citing cases). Given that Defendants' conduct falls far short

---

https://www.timesunion.com/news/article/COVID-19-vaccination-required-for-SUNY-CUNY-16165358.php. With respect to private institutions, the state's three largest private universities—New York University, Columbia University, and Cornell University—also required COVID-19 vaccinations. See Josh Moody, Colleges Requiring a Coronavirus Vaccine for Fall, U.S. News & World Report, https://www.usnews.com/education/best-colleges/articles/colleges-requiring-a-coronavirus-vaccine-for-fall-what-to-know.

of the conduct of the defendants in <u>Alexiadis,</u> this Court cannot find that Plaintiff has met the first element of an IIED claim.

Plaintiff has also not satisfied the second element of an IIED claim. Plaintiff must show that Defendants *intended* "to cause severe emotional distress." <u>Id.</u> While Plaintiff provides a long list of alleged misdeeds by Defendants, <u>see</u> Resp. at 20–22, nowhere in the Complaint does Plaintiff demonstrate that Defendants intended to cause emotional distress.

In summary, the Court dismisses Plaintiff's IIED claim, as Plaintiff has failed to adequately plead the first two elements of such a claim.

### B.  Breach of Contract and Promissory Estoppel

Plaintiff's breach of contract and promissory estoppel claims are predicated on the argument that Defendants violated the AOP Scholarship contract, Plaintiff's contract of enrollment, and the Handbook. <u>See</u> Compl. at 32–34. Defendants argue that a contract claim cannot be brought against a college or university that "failed to follow its own policies." Mot. at 12. Instead, Defendants posit that the only mechanism "for challenging a university's academic or administrative actions is through an Article 78 proceeding." <u>Id.</u>

Article 78 of the New York Civil Practice Law and Rules "establishes a streamlined process for challenging the determinations of public bodies and administrative agencies." <u>Doe v. N.Y. Univ.</u>, 537 F. Supp. 3d 483, 490 (S.D.N.Y. 2021). With respect to institutions of higher education, "[i]nternal administrative and academic determinations . . . are redressable, if at all, in an article 78 proceeding, not a plenary action." <u>Rolph v. Hobart & William Smith Colleges</u>, 271 F. Supp. 3d 386, 404 (W.D.N.Y. 2017) (quoting <u>Gertler v. Goodgold</u>, 107 A.D.2d 481, 487, 487 N.Y.S.2d 565 (1st Dep't 1985)). "'While decisions of academic institutions are not immune from judicial scrutiny, review should be restricted to special proceedings under CPLR Article 78,' as

opposed to a contract or quasi-contractual claim." Schimkewitsch v. N.Y. Inst. of Tech., No. 19-CV-5199, 2020 WL 3000483, at *5 (E.D.N.Y. June 4, 2020) (quoting Keles v. Trustees of Columbia U. in City of N.Y., 903 N.Y.S.2d 18, 18 (1st Dep't 2010)). "[C]laims based upon the rights or procedures found in college manuals, bylaws and handbooks may only be reviewed by way of an Article 78 proceeding in New York State Supreme Court." Byerly v. Ithaca Coll., 290 F. Supp. 2d 301, 305 (N.D.N.Y. 2003), aff'd, 113 F. App'x 418 (2d Cir. 2004) (citations omitted). The statute of limitations to bring an Article 78 proceeding is four months. See N.Y. C.P.L.R. 217(1) ("[A] proceeding against a body or officer must be commenced within four months.").

Plaintiff argues that an Article 78 proceeding is not the appropriate vehicle for her claims. Plaintiff states that "a college's decision that does not concern a student's academic competence or conduct is not subject to Article 78." Resp. at 15. Non-academic matters, according to Plaintiff, may be litigated through "a separate plenary action." Id. Yet as Defendants correctly point out, see Reply at 7–8, Plaintiff's understanding of Article 78 is flawed. An Article 78 proceeding is the appropriate remedial avenue for not only academic decisions, but also *administrative* decisions. See Rolph, 271 F. Supp. 3d at 404 ("Internal administrative and academic determinations . . . are redressable, if at all, in an article 78 proceeding, not a plenary action." (citation omitted)). Here, Defendants' actions constituted an internal administrative determination, as Union College removed a student based on the belief that she failed to adhere to an internal college policy. This is precisely the kind of administrative action that must be litigated via an Article 78 proceeding, and Defendants point to highly analogous case law demonstrating this point. See Reply at 8. In Mitchell v. N.Y. Univ., the New York State Supreme Court, New York County, considered a case in which New York University banned a student

from campus after the student failed to visit a mental health counselor. No. 150622/13, 2014 WL 123255 (N.Y. Sup. Ct. Jan. 08, 2014). The plaintiff in <u>Mitchell</u> challenged the university's ban, but the court found that the university's decision to ban the plaintiff "involves the 'exercise of subjective personal judgment' and is subject to review via an Article 78 proceeding." <u>Id.</u> at *1 (quoting <u>Gertler v. Goodgold</u>, 107 A.D.2d 481, 485, 487 N.Y.S.2d 565, <u>aff'd,</u> 66 N.Y.2d 946, 489 N.E.2d 748 (1985)). Much like <u>Mitchell</u>, Plaintiff here challenges a campus ban that was predicated on Plaintiff's failure to adhere to a university health requirement. Given the guidance from the New York State Supreme Court, this Court similarly finds that Plaintiff's action "is subject to review via an Article 78 proceeding." <u>Id.</u>

In addition, Plaintiff's claim is based in-large part on allegations that Defendants violated "rights or procedures found in college manuals, bylaws and handbooks." <u>Byerly</u>, 290 F. Supp. 2d at 305. Yet courts in this Circuit have made clear that those claims can "only be reviewed by way of an Article 78 proceeding." <u>Id.</u>

Given that Plaintiff's breach of contract and promissory estoppel claims must be brought under Article 78, those claims are subject to the four-month statute of limitations as specified by N.Y. C.P.L.R. 217(1). Plaintiff commenced this action on February 28, 2023—nearly eleven months after she was removed from Union College. <u>See</u> Compl. ¶ 137. Plaintiff's claims thus fall well beyond Article 78's four-month limitations period, and are time barred. For this reason, Plaintiff's breach of contract and promissory estoppel claims are dismissed with prejudice.

### C.  HRL Claims

While Defendants do not move to dismiss Plaintiff's religious and disability discrimination claims under HRL, <u>see</u> Mot. at 10 n.2, Defendants do move to dismiss Plaintiff's race, color, and/or national origin claims under HRL, <u>see id.</u> at 19–21.

"The pleading standard for an []HRL [claim] is the same as for the analogous federal law claims." Cardwell v. Davis Polk & Wardwell LLP, No. 19-CV-10256, 2020 WL 6274826, at *29 n.21 (S.D.N.Y. Oct. 24, 2020) (citing, *inter alia*, Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015)). Under the federal standard, "[t]o make out a prima facie case when alleging discrimination in the educational setting on the basis of race," a plaintiff must satisfy four elements: "(1) [s]he is a member of a protected class; (2) [s]he suffered an adverse action in pursuit of h[er] education by defendant; (3) [s]he was treated differently from similarly situated students who are not members of the protected class; and (4) [s]he was qualified to continue in h[er] educational pursuit." Johnson v. N.Y. Univ., No. 17-CV-6184, 2018 WL 3966703, at *6 (S.D.N.Y. Aug. 20, 2018) (citing Koumantaros v. City Univ. of N.Y., No. 03-CV-10170, 2007 WL 840115 at *8 (S.D.N.Y. Mar. 19, 2007)), report and recommendation adopted, No. 17-CV-6184, 2018 WL 4908108 (S.D.N.Y. Oct. 10, 2018), aff'd, 800 F. App'x 18 (2d Cir. 2020).

In her Complaint, Plaintiff provides two factual assertions to support her race, color, and/or national origin HRL claims. First, Plaintiff states that she "was singled out by defendants due to the lack of her financial resources as a first-generation college student of Mexican-American heritage." Compl. ¶ 135. Second, Plaintiff asserts that she "was singled out due to her Mexican-American heritage, and because she was seen as not being profitable to the school due to her being on a nearly full scholarship." Id. ¶ 136. Defendants argue that this is not enough to show discrimination, arguing that these "conclusory allegations are patently insufficient to plead [Plaintiff's] claim." Mot. at 20. Plaintiff counters by highlighting that she is "a low income, first-generation, brown-skinned Latina of Mexican heritage . . . attending a private liberal arts college on a need based scholarship." Resp. at 27. These, according to Plaintiff, "are sufficient factual

allegations for a fact finder to infer intentional racial and national origin based on discrimination." Id. at 27–28.

Defendants have the stronger argument. As the Supreme Court has cautioned, the federal pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and a plaintiff must allege more than the mere possibility of the alleged misconduct. Iqbal, 556 U.S. at 678–79.  Here, Plaintiff provides no evidence—other than conclusory allegations—that she was treated differently on the basis of race, color, or national origin. While Plaintiff broadly asserts that she was in fact discriminated on such grounds, that assertion is not supported by any additional factual support. Courts have been very wary of sustaining racial discrimination claims where a plaintiff has failed to plead clear facts supporting an inference of discriminatory intent. See, e.g., Ochei v. The Mary Manning Walsh Nursing Home Co., No. 10-CV-2548, 2011 WL 744738, at *3 (S.D.N.Y. Mar. 1, 2011) (noting that under both federal and HRL standards, "naked assertions by plaintiff that some protected demographic factor motivated an employment decision, without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's membership in a protected class, are simply too conclusory to withstand a motion to dismiss" (citing, inter alia, Reyes v. Erickson, 238 F. Supp. 2d 632 (S.D.N.Y. 2003))). Additionally, Plaintiff has not demonstrated that "[s]he was treated differently from similarly situated students who are not members of the protected class." Johnson, 2018 WL 3966703, at *6. Plaintiff has not pleaded, for example, that students outside of her protected class who refused to take the COVID-19 vaccine were permitted to remain on campus.

Because Plaintiff has only made broad and cursory allegations that Defendants engaged in discriminatory behavior, Plaintiff's HRL race, color, and/or national origin discrimination claims are dismissed.

### D.  Negligence and Negligence Per Se

Defendants next argue that Plaintiff's negligence and negligence per se claims must be dismissed, as Defendants owe no duty to Plaintiff. See Mot. at 21–23.

With respect to negligence, Plaintiff states that "Defendants owed Ms. Puentes a duty not to impose extra-contractual obligations on her which foreseeably could cause her illness." Compl. at 36. Plaintiff alleges that Defendants breached that duty "[b]y compelling [Plaintiff] to get the shots against her will in order to remain enrolled . . . which directly and proximately caused her to fall violently ill with physical symptoms and great pain and suffering." Id. at 37. With respect to negligence per se, Plaintiff states that Defendants denied Plaintiff "her right under" federal statute 21 U.S.C. § 300bbb-3 ("Statute") and federal regulation 45 C.F.R. § 45.116(b)(8) ("Regulation") "to decline to take the shot based on informed consent and without penalty." Id. at 36. Defendants argue that they have no duty to Plaintiff, thus defeating both the negligence and negligence per se claim. See Mot. at 23–26.

#### i.   Negligence

To plead negligence under New York law, a plaintiff must show that: "(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result of that breach." Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112, 116 (2d Cir. 2006) (citation omitted). New York courts have emphasized the difficulty in sustaining a negligence claim by a student against a college of university, as "New York has affirmatively rejected the doctrine of in loco parentis at the college

level." <u>Pasquaretto v. Long Island Univ.</u>, 964 N.Y.S.2d 599, 599 (App. Div. 2013) (cleaned up). However, a duty "may be imposed upon a college where it has encouraged its students to participate in an activity and taken affirmative steps to supervise and control the activity." <u>Id.</u> at 599.

Plaintiff argues that Defendants' actions fall under the <u>Pasquraetto</u> "encouraged its students to participate in an activity" exception. <u>See</u> Resp. at 21. Plaintiff states that Defendants both "encouraged" and "mandated" that students receive the COVID-19 vaccine and booster. <u>Id.</u> Plaintiff further argues that because Defendants supervised Plaintiff's health and rejected Plaintiff's requested exemption, Defendants further took on a duty to Plaintiff. <u>Id.</u> at 22. This argument is unconvincing. <u>Pasquaretto</u>'s "encouraged its student participate in an activity" language is lifted from another state case, <u>Hores v. Sargent</u>, 646 N.Y.S.2d 165 (App. Div. 1996). <u>See</u> <u>Pasquaretto</u> N.Y.S.2d at 599. In <u>Hores</u>, a community college facilitated a cycling trip, in which the college "organized, planned, and supervised" the trip and "examined and selected the subject bike route, prepared the bike map, operated three vans to assist bicyclists during the trip, and instructed the participants on safety issues." 646 N.Y.S.2d at 166. Given this "sufficient degree of control over the subject event," the court found that the college had a legal duty to plaintiff. <u>Id.</u> Here, by contrast, the factual nature is quite different. Defendants were not organizing an activity or outing that could be potentially dangerous, such as a cycling trip. Instead, Defendants simply enacted a vaccination policy and enforced that policy. Establishing a college-wide vaccination policy, in which individual students are both responsible for the timing and type of vaccine they receive and able to request exemptions, is different from organizing an "activity" or "event." Furthermore, Plaintiff does not point to any case law—and this Court is unaware of the existence of such case law—finding that the imposition and enforcement of

19

vaccination policies creates an inherent duty on the part of a college or university. Such a finding would inherently widen the scope of liability against nearly all institutions of higher education, most of whom enacted COVID-19 vaccine requirements. See supra note 3. This vast expansion of liability would inherently conflict with New York's limited scope of duty for universities, as the state "has affirmatively rejected the doctrine of in loco parentis." Pasquaretto, 964 N.Y.S.2d. at 599.

Plaintiff also argues that Defendants have a "duty implied in contract," and she asserts that her enrollment at the college and her AOP Scholarship contract created an inherent duty on the part of the college. See Resp. at 16–21. This argument has two fatal flaws. First, as Defendants correctly point out, see Reply at 14, duty under a negligence theory does not arise under New York law simply through contract. Courts have repeatedly emphasized that "[i]t is well-settled that a claim arising out of an alleged breach of contract may not be converted into a tort action, absent the violation of a legal duty or special relationship *independent of that created by the contract.*" City of Syracuse v. Loomis Armored US, LLC, 900 F. Supp. 2d 274, 303 (N.D.N.Y. 2012) (emphasis added) (citing Givoldi, Inc. v. United Parcel Service, 286 A.D.2d 220, 221, 729 N.Y.S.2d 25 (1st Dep't 2001)). Second, Plaintiff's contractual duty theory appears nowhere in her Complaint. As courts have emphasized, "[a] plaintiff . . . is not permitted to interpose new factual allegations or a new legal theory in opposing a motion to dismiss." Uddoh v. United Healthcare, 254 F. Supp. 3d 424, 429 (E.D.N.Y. 2017). This failure to include the contractual duty theory in the Complaint thus deprives Plaintiff of the opportunity to make such an argument here.

For these reasons, the Court dismisses Plaintiff's negligence claim.

*ii.    Negligence Per Se*

Under New York law, the "violation of a State statute that imposes a specific duty constitutes negligence per se, or may even create absolute liability." In re Sept. 11 Prop. Damage & Bus. Loss Litig., 468 F. Supp. 2d 508, 522 (S.D.N.Y. 2006) (quoting Elliott v. City of New York, 95 N.Y.2d 730, 734 (2001)), aff'd sub nom. Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166 (2d Cir. 2013).

Plaintiff's Complaint suggests that Defendants violated the Statute and the Regulation by requiring Plaintiff to take the COVID-19 vaccine, and such a violation constitutes negligence per se. See Compl. at 35–36. Yet, after reviewing both the Statute and Regulation, the Court does not find any language suggesting that a university or college may not require a student to take a vaccine. Furthermore, and as Defendants correctly point out, the Statute applies specifically to "parties . . . that introduce medical products into interstate commerce." See Mot. at 22 (citing Wall v. Transportation Sec. Admin., No. 21-CV-1220, 2023 WL 1830810, at *2 (D.C. Cir. Feb. 9, 2023), cert. denied sub nom. Abadi v. Transportation Sec. Admin., 144 S. Ct. 272, (2023)). The Statute is therefore inapplicable to Defendants. In addition, the Regulation only applies to "research involving human subjects conducted, supported, or otherwise subject to regulation by any Federal department or agency." 45 C.F.R. § 46.101. As this case does not concern "research involving human subjects," the Regulation is similarly inapplicable. Given that neither the Statute nor Regulation apply to Defendants, Defendants could not have violated either. The claim is therefore dismissed with prejudice.

**E.  Libel and Slander**

Defendants next move to dismiss Plaintiff's libel and slander claims. See Mot. at 23–26. Plaintiff does not appear to challenge Defendants' argument anywhere in her Response. See

generally Resp. The Complaint hinges its libel and slander claims on the allegation that Wadja's comments to local media—specifically, Wadja's statement that "we can state emphatically that no students have been expelled for refusing to get a booster shot"—"called [Plaintiff's] truthfulness and integrity into question and falsely painted [Plaintiff] as a liar." Compl. at 37–39.

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." Biro v. Conde Nast, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (citation omitted). "Under New York law, a plaintiff must establish five elements to recover in libel: (1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face)." Id. (quoting Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 176 (2d Cir. 2000)). Per se actionability occurs if a statement is made that "(1) charges the plaintiff with a serious crime; (2) tends to injure the plaintiff in her trade, business, or profession; (3) accuses the plaintiff of having a loathsome disease; or (4) imputes unchastity to a woman." Cain v. Esthetique, 182 F. Supp. 3d 54, 72 (S.D.N.Y. 2016), aff'd sub nom. Cain v. Atelier Esthetique Inst. of Esthetics Inc., 733 F. App'x 8 (2d Cir. 2018). If an alleged defamatory statement relates to "any communication in a place open to the public or a public forum in connection with an issue of public interest," then a plaintiff must plead "actual malice" pursuant to New York's anti-SLAPP statute. N.Y. Civ. Rights Law § 76-a. Public interest is defined "broadly," and relates to "any subject other than a purely private matter." Id. Actual malice is "defined as 'knowledge of its falsity or reckless disregard for the truth.'" Coleman v. Grand, 523 F. Supp. 3d 244, 255 (E.D.N.Y. 2021) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974)).

Here, Plaintiff has failed to plead the final element of a libel or slander claim: special

damages or per se actionability. See Mot. 24–26. A plaintiff is required to plead special damages

"with sufficient particularity," and generalized statements regarding harms incurred do not

constitute such particularity. LoanStreet, Inc. v. Troia, No. 21-CV-6166, 2022 WL 3544170, at

*8 (S.D.N.Y. Aug. 17, 2022). "Special damages consist of 'the loss of something having

economic or pecuniary value which must flow directly from the injury to reputation caused by

the defamation.'" Celle, 209 F.3d at 179 (quoting Matherson v. Marchello, 100 A.D.2d 233, 235,

473 N.Y.S.2d 998 (2d Dep't 1984)). Here, Plaintiff has not pled special damages. Plaintiff states

that Wadja's statements "stand[] to cause special harm to [Plaintiff], who one day hopes to attend

law school and take bar examinations such that her character and fitness to practice law,

including with respect to her being expelled from Union College, will be called into question."

Compl. at 38. This kind of pleading for special damages—in which a plaintiff states that future

career or educational opportunities may be harmed by allegedly libelous or slanderous

statements—has been routinely rejected by courts in this Circuit. See, e.g., Lue v. JPMorgan

Chase & Co., No. 19-CV-9784, 2021 WL 1108558, at *6 (S.D.N.Y. Mar. 23, 2021) (finding that

a plaintiff had failed to plead special damages where the plaintiff alleged that her "career

prospects have been drastically reduced" by the defendant's statements); D.W.M. by Moore v.

St. Mary Sch., No. 18-CV-3099, 2019 WL 4038410, at *17 (E.D.N.Y. Aug. 27, 2019) (finding

that special damages had not been pleaded where a plaintiff alleged, inter alia, that a defendant's

statements may have caused a "loss of academic and future opportunities"). Furthermore,

Plaintiff pleads no "loss of something of economic or pecuniary value." Celle, 209 F.3d at 179.

Plaintiff has also not pled per se actionability. Plaintiff might argue that she falls into the

second category of per se libel or slander: speech that "tends to injure the plaintiff in her trade,

business, or profession." <u>Cain</u>, 182 F. Supp. 3d at 72. Yet as Defendants correctly point out, <u>see</u> Mot. at 25, a student is not considered a "profession" under the <u>Cain</u> standard. <u>See Cain</u>, 182 F. Supp. 3d at 73 (finding that applying the "trade, business, or profession . . . category to students . . . makes little sense," as such an application "is too speculative to justify the presumption of damages" (citations omitted)). Therefore, because Plaintiff has failed to plead per se actionability or special damages, she has failed to meet the final element of a libel or standard claim.

Because Plaintiff has failed to plead special damages or per se actionability, her libel and slander claims fail and are dismissed.

### F.  Dismissal With Prejudice

Finally, Defendants move to dismiss each of the claims discussed in the Motion with prejudice, arguing that "there are significant substantive defects in Plaintiff's Complaint, which cannot be cured by amendment." <u>Id.</u> at 26–27. The Court agrees to some extent, and dismisses Plaintiff's breach of contract, promissory estoppel, and negligence per se claims with prejudice. Yet the Court declines to dismiss Plaintiff's HRL, IIED, negligence, libel, and slander claims with prejudice. The Court cautions, however, that it is very skeptical that Plaintiff can plead sufficient facts in an amended filing to support these claims, and that only a substantial change in the pleadings would allow these claims to proceed.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion, Dkt. No. 8, is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that Plaintiff's claims for breach of contract (Count II); promissory estoppel (Count III); and negligence per se (Count VI) are **DISMISSED with prejudice**; and it is further

**ORDERED**, that Plaintiff's claims for intentional infliction of emotional distress (Count I); discrimination on the basis of race, color, and/or national origin under N.Y. Human Rights Law § 296 (Count IV)[4]; negligence (Count VII); libel (Count VIII); and slander (Count IX) are **DISMISSED without prejudice**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 28, 2024
            Albany, New York

LAWRENCE E. KAHN
United States District Judge

---

[4] Plaintiff's discrimination on the basis of religion and disability claims under N.Y. Human Rights Law § 296 were not challenged by Defendants and therefore survive.